Maynard, J.
 

 In November, 1882, the plaintiff was a member of a pool or association of land carriers, which was engaged with the defendant, an ocean carrier, in the joint undertaking of
 
 *902
 
 transporting cotton from Gainesville, Texas, to Liverpool, England. The freight charge to the shipper or consignee was entire, but by an agreement among the carriers it was divided between the association and the defendant in the ratio of twenty-five to seven. The respective proportions which the several members of the association were entitled to receive for the land carriage was also fixed by an agreement between them. It is assumed that the shippers were not liable for the freight charges, but they were to be collected from the consignee upon delivery of the goods at the port of destination. The agreement for shipment consisted of a through bill of lading,, which, in terms, so required, and by the-rules of commercial law the carriers had a lien upon the property for the freight until it was paid, and in default of payment they could withhold delivery, and sell the cotton for the satisfaction of their charges.
 

 The carriers also had an insurable interest in the goods to the extent of their lien, and they thus had the means of complete-indemnity against loss, in case of the insolvency of the consignee or the destruction of the property
 
 in transitu.
 
 The particular consignment involved in this action urns a shipment of two hundred and sixty-six bales of cotton on November 15, 1882, which was delivered to the defendant January 22, 1883, upon the pier at New York, where its next steamer for Liverpool was to load. Before the lading of the vessel, and while the cotton was upon the pier, it was burned, presumably without the fault of either of the parties to this action. By an agreement between the land carriers, each company upon receipt of the goods, or at the next settlement day thereafter, paid to the company from which the goods were received its proportion of the freight charges and the amount advanced by it to the company from which it had received the goods. The plaintiff was the last carrier by land, which received thegoods and transported them to New York and delivered them upon the pier for carriage by the defendant. It had, therefore, paid or earned the land carrier’s proportion of the entire freight, which amounted to $1,647, and it claims that immediately upon the delivery of the cotton upon the pier at New York for shipment by the defendant, the latter became bound, as upon a contract obligation, to pay that sum to it. The only written agreement to which the parties assented is contained in the through bill of lading and the special bills attached, and we fail to find in them any provision from which any such obligation can be implied. On the contrary they inferentially refute the existence of a liability of this kind. By the terms of the through bill of lading the entire freight was to be collected by the defendant upon the completion of the carriage of the goods and their delivery to the consignee at Liverpool. Until that had been accomplished the written contract imported no duty either expressed or implied on the part of the defendant to reimburse the land carriers for their share of the cost of transportation. It also appears from the special bill of lading given by the defendant to the plaintiff that it expressly stipulated for exemption from liability for all damage, loss or injury arising from fire before loading in the ship in terms so com
 
 *903
 
 prehensive as to include not only the owner, but every person like the plaintiff who had a special interest in the property by way of lien for services rendered.
 

 The plaintiff in fact concedes that there is nothing in the bills of lading which imposes the liability upon the defendant which it is attempting to enforce, but it insists that there was a prevailing custom or usage in this class of business of such long standing and so generally recognized that it implied an agreement on the part of each carrier immediately upon the receipt of the goods to assume a liability to pay all the charges previously earned or paid by the company from which they were received. All the evidence given upon the trial related to this usage, and the only exception reviewable upon this appeal pertains to the refusal of the trial judge to submit the "question to the jury whether the evidence did not establish a contract on the part of the defendant, based upon this usage, to pay plaintiff for the advance charges and freight earned upon the delivery of the goods by the plaintiff to the defendant. There was a substantial agreement in the testimony of all the witnesses upon this subject and we do not think that it was properly susceptible of any conflicting inferences. We fail to find in it any proof of a usage or agreement to become liable for the accrued freight charges upon delivery of the goods upon the pier. Whatever may be the custom in this respect between land carriers, there is an entire unanimity in the statements of all the witnesses upon both sides to the effect that the steamship companies never engaged to become liable for the land charges until the goods had been laden upon the vessel, at which time it was their custom to ascertain the quantity and make out the bill for the freight and insure the goods for the voyage. Insurance was never effected by the steamship company while the goods were lying upon the pier. This usage was so inflexible that if the steamship company could not carry the entire consignment by one vessel and the goods were divided and carried by different vessels sailing at different times, separate bills were made for each part as the vessel carrying it sailed, and payment was made for each separately and in no case until after it was upon shipboard. It appears from the evidence of plaintiff’s general freight agent that when these through bills of lading were first adopted the shipments were taken immediately from the plaintiff’s barges and put on the vessels, and if there was delay in shipment the property lay upon the plaintiff’s docks until it could be loaded upon shipboard, and there could then be no occasion for any dispute as to liability for advance charges. But as the volume of the business increased, additional storage capacity was required, and the goods would be transferred to the steamship company’s piers to await the company’s convenience for shipment. Their obligation would seem to have been to take the goods by the first vessel not otherwise engaged, and the storage upon their piers 'Was evidently in the first instance permitted for the convenience of the railroad company. It also appears by the evidence of the same witness that the steamship company origin
 
 *904
 
 ally charged a commission for advancing the amount of the hack charges before the collection of the freight at Liverpool; and it was finally agreed that the rate of exchange should be fixed at 4.80, which would afford the steamship company a margin in lieu of the commissions and of the expense of insuring the amount of the back charges during the voyage.
 

 It is, therefore, apparent that possession on shipboard was always regarded as a condition precedent to the existence of any liability on the part of the ocean carrier for the land charges, and the case is destitute of any competent proof to establish an agreement or usage which would obligate the steamship company to pay while the goods were still at the pier. Every witness disclaims knowledge of any such custom, and, in the long course of business proven, extending over a period of twenty years and upwards, not a single instance is shown where payment has been demanded or expected before the goods were put upon the vessel, or where payment has been made unless they were actually on board the ship. It is claimed by plaintiff's counsel that the Inman line of steamers paid the advance charges upon some bales of cotton lying upon their pier which were destroyed by fire at the same time with the cotton upon defendant’s pier, but the evidence does not sustain the claim. The cotton upon the Inman pier was only damaged, and not destroyed. A survey was called for and the cotton sold ftir the account of whom it might concern and some $400 realized. The insurance company which had paid the loss to the owners, ascertaining that this money was in the hands of the agents of the In-man line, made claim to it and it was paid over to them without any deduction for the freight charges, which amounted to $62. Subsequently the railroad company notified the Inman line that the back charges had not been paid, and the Inman company notified the insurance company, which refunded the amount and it was paid over to the railroad company. The transaction can not be construed as a recognition by the steamship company of a liability to pay the back charges while the goods were lying upon the pier, but rather to the contrary. It seemed to indicate that it was the understanding of all the parties that the charges were a lien upon the goods which must first be paid out of the proceeds of their sale, and that the lien of the railroad company was not lost by the delivery of the goods to the steamship company upon the pier, but continued until the charges had been actually paid. As the contract for shipment was entire, each carrier had a lien upon the goods for his unpaid freight until they were delivered to the consignée, and the possession of any carrier engaged in the joint enterprise would be deemed the possession of any other carrier whose proportion of the freight charges had not been paid so-far as might be required to support the lien therefor.
 

 We think the case was properly disposed of at the circuit and that the judgment and order should be affirmed, with costs.
 

 All concur.